**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DARRELL JARRETT,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 09 C 7137** |
| | ) | |
| **DAVE REDNOUR, Warden,** | ) | |
| **Menard Correctional Center,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

An Illinois jury convicted Darrell Jarrett of two counts of first-degree murder and

one count of aggravated discharge of a firearm in connection with the shootings of

Willie Key and Anthony Harris.  The trial judge sentenced Jarrett to a prison term of life

without parole.

Jarrett has petitioned this Court for a writ of habeas corpus under 28 U.S.C. §

2254.  He contends that his trial and appellate counsel rendered ineffective assistance

and that the prosecution withheld material exculpatory evidence from him.  For the

reasons stated below, the Court denies Jarrett's petition and declines to issue a

certificate of appealability.

**Background**

**A.      The shooting**

Jarrett does not dispute that he shot and killed Willie Key and Anthony Harris on

December 29, 1999.  He contends that he shot them in self-defense or, in the

alternative, that he should have been convicted of second-degree murder instead of first-degree murder on a theory that he unreasonably believed that he was acting in self-defense.

Jarrett states that Travoy Williams picked him up on December 29 from his home at around 8:30 a.m., and they went to buy heroin. After purchasing and snorting the heroin, they returned to Williams's home. Nearby, they acquired more heroin, and then took Williams's car to a car wash. They were followed to the car wash by Tarimako Allen, who picked them up in her brown Chevy van. Jarrett states that the three of them continued to drive together, and Williams and Jarrett continued to snort heroin. At some point they picked up Linda McGhee. The four drove to three different locations looking for more heroin. At one location they bought marijuana for the women to smoke. Both Williams and Jarrett carried guns and rode in the second row of seats in the van.

The four eventually found themselves driving toward Williams's home on Lexington Street. They turned west on Lexington and passed a location where drugs could be bought and a crack house. As they passed a house, Williams told Allen, who was driving, to stop and back up. The van came to a stop very close to a black Chevy Lumina. Referring to the people milling around on the street, Jarrett states that he asked Williams, "Is that some of [t]he [g]uys?" Am. Pet. ¶ 14. He claims that by this he intended to ask if the people on the street were friends of his and Williams's. Jarrett then got out of the van on the passenger side to see if a man named Ralph was there. While he was walking beside the van, Jarrett heard gunfire on the other side of the van. He claims that he did not know who fired the shots. After the shots were fired, the van

2

began to roll forward. Jarrett also claims that someone yelled, "look out . . . stick up men," though he did not testify to this at trial. Am. Pet. ¶ 14; Ans. to Am. Pet. ¶ 33.

Jarrett felt exposed because of the gunfire and because the van had begun to drive away. He now claims that he saw Michael Blue, a witness who testified before the grand jury but not at trial, aiming a gun at him. Jarrett did not testify at the trial that Blue had aimed a gun at him. He testified that he saw people running in every direction, including toward him. Resp. Ex. G at 69–70. He pulled out his gun and, without moving from where he was standing, began to fire into a crowd of people running around. After firing four or five shots, Jarrett ran to the van and got in. The two women in the van dropped Williams and Jarrett off at the home of Jarrett's sister and brother-in-law and then parked the van behind the apartment building. Police arrived shortly thereafter and arrested Jarrett, Williams, and the two women.

Witnesses for the prosecution testified differently. Allen testified that Williams directed her to Lexington Street. McGee testified that once they had arrived on Lexington, Jarrett asked Williams, "Is that the guys?" Resp. Ex. E at 8. Williams answered that he thought so and told Allen to back up toward the Lumina. Allen stated that once the van came to a stop, Williams pushed her to the floor. She heard gunshots and assumed that Williams was firing. Allen heard more shots from outside the van, and then Jarrett got into the van and they drove off.

Barbara Starling was a witness at the scene who had parked her car behind the Lumina. She saw Harris and Key sitting in the Lumina. A passenger in her car left and got into the backseat of the Lumina. She saw a brown van arrive and back up to the Lumina. Starling then saw and heard six or seven shots come from the driver's window

3

of the van. She saw Harris and Key run from the Lumina and attempt to run away through a gangway. She then saw Jarrett walking along the passenger side of the van. He had a gun in his hand and shot at Harris and Key six or seven times. He then got back in the van, which drove away.

Devon Joshua testified that he stood at the driver's side window of the Lumina talking to Harris and Key. He saw a brown and tan van drive past the Lumina and then back up so that the two cars were even with each other. He saw one woman driving the van and another sitting in the front passenger seat. Joshua saw Williams push down the woman driving the van and aim a gun at him. He ducked after the first shot but could see Jarrett getting out of the van. Joshua then dove under the Lumina. From there, he heard approximately seven gunshots coming from the van's window. He then saw feet walking from the passenger side of the van to the curb of the street and heard five more gunshots, closer to him than those that had come from the van. Joshua saw the feet walk back to the van and heard the passenger door shut.

## B. Trial and direct appeal

In 2003, Williams and Jarrett were tried simultaneously before separate juries. Jarrett's attorney admitted during his closing argument that Jarrett had been on Lexington Street and had fired the shots which killed Harris and Key. Resp. Ex. H at 64, 66. He argued that Jarrett was innocent because he had acted in self-defense or that the jury should convict Jarrett of second-degree murder rather than first-degree murder because Jarrett believed that he was acting in self-defense. The jury convicted Jarrett of first-degree murder on both counts and also on the charge of aggravated discharge of a firearm. The trial judge sentenced him to a prison term of life without

4

parole on September 4, 2003.

Jarrett appealed.  His appointed appellate counsel only made a single claim, arguing that Jarrett's retained trial counsel had been constitutionally ineffective when he failed to move to suppress guns discovered in the home where Jarrett and Williams were arrested.  The appellate court affirmed Jarrett's conviction.  Jarrett then filed a *pro se* petition for leave to appeal (PLA) to the Illinois Supreme Court.  The court denied the petition.

## C.    First state post-conviction petition

On February 28, 2006, Jarrett filed a *pro se* post-conviction proceeding in state court under 725 ILCS 5/122-1.  He raised eight claims:  (1) the trial court's instruction on accountability improperly lowered the prosecution's burden of proof; (2) the prosecution's accountability theory was not charged in the indictment; (3) the indictment was vague; (4) his sentence violated the Proportionate Penalties Clause of the Illinois Constitution; (5) the prosecution suppressed material exculpatory evidence that law enforcement had taken a blood sample from him in violation of his due process rights, *Brady v. Maryland*, 373 U.S. 83 (1963); (6) the Illinois warrantless arrest statute was unconstitutionally vague; (7) trial counsel was constitutionally ineffective because he failed to object to the accountability instruction and the prosecution's use of an accountability theory in its closing argument; and (8) appellate counsel was constitutionally ineffective for failing to challenge trial counsel's ineffectiveness regarding the accountability instruction.  The trial court determined that the proportionate penalty and *Brady* claims were waived because they could have been

5

brought on direct appeal and that the other claims lacked merit.  It dismissed the entire petition on May 31, 2006.

Jarrett appealed.  Appointed counsel from the appellate defender's office asked to withdraw because there were no issues of arguable merit.  The appellate court allowed the appellate defender to withdraw as counsel but appointed new counsel. Jarrett's appellate brief raised only two of the issues that he had asserted in his post-conviction petition:  ineffective assistance of trial and appellate counsel related to the accountability instruction, and the challenge to the prosecution's statements about accountability during closing argument.  The appellate court affirmed on August 22, 2008.  It held that the trial court properly gave an accountability instruction and that any error was harmless, and thus Jarrett had not received ineffective assistance of counsel from either his trial or appellate counsel.  Resp. Ex. T at 10–11.

Jarrett's appointed counsel filed a PLA with the Illinois Supreme Court.  Counsel asserted trial and appellate ineffective assistance but focused on the argument that the appellate court had not used the proper standard of review for a post-conviction petition that had been summarily dismissed.  The court denied the petition on September 30, 2009.

**D.     Second state post-conviction petition**

On July 2, 2007, Jarrett filed a second *pro se* post-conviction petition in state court.  In the petition, Jarrett argued that he was actually innocent of first-degree murder, he had received ineffective assistance of counsel at trial and on appeal, and the prosecution withheld both the identity of an eyewitness to the shooting who confirmed Jarrett's story and the fact that Starling was paid for her testimony.  Jarrett

6

specifically claimed that the trial attorney had been constitutional ineffective in the following ways: (1) he did not conduct a pretrial investigation; (2) he did not interview witnesses before trial; (3) he moved to suppress a statement Jarrett made after arrest that supported the self-defense theory; (4) he failed to object to an irregular fitness hearing conducted by the trial court; (5) he did not introduce the post-arrest statement; (6) he did not call as witnesses the police officer and prosecutor who had witnessed Jarrett's post-arrest statement; (7) he moved to exclude grand jury testimony that supported Jarrett's self-defense theory; (8) he failed to offer testimony which rebutted the prosecution's assertion that Williams and Jarrett were hunting the victims; (9) he failed to ask follow-up questions regarding a statement by Starling at trial that indicated that the victims initially got out of their car to confront Jarrett; (10) he instructed Jarrett not to testify that Blue had aimed a gun at him; and (11) he allowed many sidebars and discussions between the attorneys and the trial court to occur off the record. In the petition, Jarrett further claimed that appellate counsel failed to argue that these actions made trial counsel constitutionally ineffective.

The trial court summarily denied the petition on September 5, 2007. Jarrett appealed. His appointed counsel made four claims: (1) actual innocence; (2) ineffective assistance of trial counsel for failure to investigate Jarrett's self-defense claim; (3) ineffective assistance of trial counsel for instructing Jarrett not to testify that Blue aimed a gun at him; and (4) the prosecution's withholding of the identity of an eyewitness who supported Jarrett's self-defense argument violated due process. The appellate court rejected the actual innocence claim, concluding that Jarrett's evidence was not newly discovered and would not have changed the outcome of the trial. *People*

7

*v. Jarrett*, 399 Ill. App. 3d 715, 723–25, 927 N.E.2d 754, 763–64 (2010). The court

further determined that Jarrett had forfeited his ineffective assistance of counsel claims

and his *Brady* claim by failing to raise them in his direct appeal or initial postconviction

petition. *Id.* at 725–28, 927 N.E.2d at 764–67. The court held that Jarrett had not

established cause and prejudice for his failure to bring these claims earlier. *Id.* at

726–28, 927 N.E.2d at 765–67. The court held in the alternative that Jarrett's *Brady*

argument failed because the allegedly suppressed evidence was not material. *Id.* at

728; 927 N.E.2d at 767.

Jarrett's appellate counsel filed a PLA with the Illinois Supreme Court raising the

same four claims. The court denied the petition on September 29, 2010.

## Discussion

A person convicted in state court may obtain a writ of habeas corpus on a claim

that was adjudicated on its merits in state court only if the state court's adjudication of

the claim "resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of

the United States; or resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d)(1), (2); *Griffin v. Pierce*, 622 F.3d 831, 841 (7th Cir.

2010).

A state court decision is contrary to clearly established federal law if "the state

court applies a rule different from the governing law set forth in Supreme Court cases,

or if it decides a case differently than the Supreme Court has done on a set of

8

materially indistinguishable facts." *Woods v. Schwartz,* 589 F.3d 368, 377 (7th Cir. 2009) (brackets and internal quotation marks omitted). A decision "is an unreasonable application of clearly established federal law if it correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case." *Id.* at 378 (internal quotation marks omitted). The petitioner must show that the state court's decision "was so erroneous as to be objectively unreasonable." *Id.* (internal quotation marks omitted). Finally, a state court decision is considered to be based on an unreasonable determination of the facts in light of the evidence presented if the petitioner is able to rebut, by clear and convincing evidence, the presumption of correctness that applies to state court fact-finding. *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

Jarrett raises three groups of claims. First, he claims that his trial counsel was constitutionally ineffective in eleven ways: (1) he did not conduct any pretrial investigation; (2) he did not interview witnesses before trial; (3) he allowed the court to conduct an irregular fitness hearing; (4) he moved to suppress grand jury testimony that supported Jarrett's self-defense claim; (5) he failed to bring forth testimony that countered the prosecution's assertion that Jarrett was hunting the victims; (6) he failed to question Starling further after she testified on cross examination that the victims initially moved to confront Jarrett before attempting to run away; (7) he instructed Jarrett not to testify that Blue aimed a gun at him; (8) he failed to introduce a post-arrest statement by Jarrett that supported the self-defense theory; (9) he failed to call witnesses who had heard Jarrett's post-arrest statement; (10) he did not object when the judge held various sidebars and conversations with the attorneys off the record; and

(11) he did not object to the accountability instruction. Second, Jarrett claims that his counsel on direct appeal was constitutionally ineffective when he failed to raise trial counsel's ineffectiveness as it related to the failure to object to the fitness hearing, failure to develop Starling's testimony, failure to get all trial proceedings on the record, and failure to object to the accountability instruction. Finally, Jarrett claims that the prosecution violated his due process rights by withholding material exculpatory evidence, specifically, the identity and existence of an eyewitness and a police report, both of which he contends corroborated his self-defense theory.

## A.      Ineffective assistance of trial counsel

Respondent contends that Jarrett procedurally defaulted all but one of his ineffective assistance claims because he did not raise them in his direct appeal or first state post-conviction petition. It argues that only Jarrett's last ineffectiveness claim, related to the accountability instruction, may be addressed on the merits.

### 1.      Claims not made until the second state post-conviction petition

"To obtain federal habeas review, a state prisoner must first submit his claims through one full round of state-court review." *Johnson v. Hulett*, 574 F.3d 428, 431 (7th Cir. 2009). Jarrett must have "fairly presented the substance of [his] claims to the state courts by articulating both the operative facts and applicable law that [he] claims entitle [him] to relief." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Gonzales v. Mize*, 565 F.3d 373, 380 (7th Cir. 2009) (internal quotation marks omitted). If a state court finds that the petitioner has waived

his claim, those claims are procedurally defaulted and cannot be reviewed "unless the petitioner can demonstrate both cause for and prejudice from the default or that a miscarriage of justice will occur if [the Court does] not consider his claims." *Woods*, 589 F.3d at 373. "Under Illinois law, 'any claim of substantial denial of constitutional rights not raised in the original or an amended petitioner is waived.'" *Id.* at 376 (quoting 725 ILCS 5/122-3) (brackets omitted).

In his first post-conviction petition, Jarrett presented only his ineffectiveness claim related to the accountability instruction. He did not present the other ten ineffective assistance claims until his second post-conviction petition. Further, after the trial court denied his second post-conviction petition, he raised only two ineffectiveness arguments on appeal, those relating to pretrial investigation and trial counsel's alleged instruction not to testify that Blue aimed a gun at him.

For his other ineffectiveness claims, Jarrett did not "invok[e] one complete round of the state's established appellate review process," and thus the claims are procedurally defaulted. *Byers v. Basinger*, 610 F.3d 980, 985 (7th Cir. 2010) (internal quotation marks omitted). Jarrett argues that the appellate court's review was *de novo*, and thus by appealing he effectively put the entire petition before the court. But "the burden is on the petitioner to raise his federal claim in the state court at a time when state procedural law permits its consideration on the merits, even if the state court could have identified and addressed the federal question without its having been raised." *Id.*

Even the two ineffective assistance claims that Jarrett asserted on appeal from

11

the denial of his second post-conviction petition were forfeited. The Illinois Appellate Court determined that the claims were forfeited because Jarrett could have raised them in his first post-conviction petition, but did not. *Jarrett*, 399 Ill. App. 3d at 725, 727, 927 N.E.2d at 764, 766. As a result, all ten of Jarrett's ineffective assistance claims are procedurally defaulted.

Jarrett argues that the Court can nonetheless review his ineffectiveness claims because his procedural default is excused by cause and prejudice. He contends that an Illinois Department of Corrections rule made it hard for him to obtain the assistance of other prisoners, that the prisoner who initially assisted him did a poor job, and that when a more capable prisoner agreed to help him, prison discipline and procedures made it hard for Jarrett to communicate with him.

"Cause for a default is ordinarily established by showing that some type of external impediment prevented the petitioner from presenting his claim." *Promotor v. Pollard*, 628 F.3d 878, 887 (7th Cir. 2010) (internal quotation marks omitted). A prisoner filing a post-conviction petition, however, has no constitutional right to the assistance of counsel. *Coleman v. Thompson*, 501 U.S. 722, 752 (1991). Thus, ineffective assistance of counsel in a post-conviction proceeding does not constitute cause excusing a procedural default. *Byers*, 610 F.3d at 987. Jarrett's *pro se* status likewise does not constitute cause excusing his default. *Harris v. McAdory*, 334 F.3d 665, 668 (7th Cir. 2003); *see Barksdale v. Lane*, 957 F.2d 379, 385 (7th Cir. 1992) ("Thus, a petitioner's failure to act or think like a lawyer cannot be cause for failing to assert a claim." (internal quotation marks omitted)). In view of the fact that Jarrett had

no right to legal counsel for his post-conviction petitions, the fact that he had trouble finding another prisoner to assist him and his contention that a prisoner who did assist him did a poor job do not amount to cause. *See Henderson v. Cohn*, 919 F.2d 1270, 1272–73 (7th Cir. 1990) (procedural default not excused by the fact that prisoner was forced to rely on jailhouse lawyers).

Jarrett also contends that if the Court does not consider his claims, it will amount to a miscarriage of justice because he is actually innocent. *See Woods*, 589 F.3d at 377. A petitioner asserting actual innocence "must *demonstrate* his innocence. Indeed, he comes before the habeas court with a strong—and in the vast majority of the cases conclusive—presumption of guilt." *Id.* (emphasis in original; internal quotation marks, brackets, and citation omitted). "To rebut this presumption, [he] must make a credible claim, supported by new, reliable evidence of his innocence. He must establish that in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* (citation and internal quotation marks omitted).

Jarrett argues that he is actually innocent of first-degree murder both because he acted in self-defense and because he unreasonably believed he was acting in self-defense. He offers two pieces of new evidence. The first is an affidavit from Charles Ginns, a claimed eyewitness to the shooting, which Ginns signed in 2007. Pet. Ex. 5. Ginns confirms Jarrett's version of events on that day. He states that he saw Jarrett standing outside the van before hearing any shots. Ginns heard someone yell "stick up man," and the van pulled away. *Id.* at 1. He then saw Michael Blue, who was standing

in the gangway as though he were acting as security, pull out a gun "to throw down on" Jarrett. *Id.* Only after Blue had pulled a gun did Ginns see Jarrett draw a gun and shoot.

Jarrett also offers a police report that states that both victims were getting out of their car as Jarrett got out of the van and fired. Pet. Reply, Ex. 5. Jarrett claims that this supports testimony by Starling that, after Williams had fired shots from the van, one of the victims and another man initially moved toward Jarrett. Resp. Ex. D at 141. Jarrett contends that these two additional pieces of evidence support his self-defense theory because they show that he feared the imminent use of force against him. *See* 720 ILCS 5/7-1, 5/9-2.

This evidence does not establish that no reasonable juror could have found Jarrett guilty of first-degree murder beyond a reasonable doubt. Starling testified that after someone fired shots from within the van, the victims jumped out of their car and tried to run away. Resp. Ex. D at 107–08. She then saw Jarrett get out of the van with a gun in his hand and shoot both victims as they ran. *Id.* at 108–09. Although Starling said that Harris moved toward Jarrett after the shooting had begun, she immediately followed that by saying that every time the victims tried to get up and run, Jarrett would shoot at them. *Id.* at 141–43. Joshua testified that after the initial shots, he ducked behind the Lumina and saw Jarrett get out of the van. *Id.* at 178–80. He then dove under the Lumina and from there saw feet coming closer to the curb and heard gunshots that were fired from closer than the van. *Id.* at 181–84.

According to both witnesses, Jarrett did not leave the van until Williams opened

14

fire, making it unlikely that he was innocently caught in a firefight and forced to defend himself and more likely that he and Williams were working together to shoot the victims. The police report that Jarrett claims is exculpatory also supports this description of the events. The report does not mention Williams's initial shots from the van, which Jarrett does not dispute occurred, but says that the victims were getting out of the Lumina at the same time that Jarrett exited the van and opened fire. Pet. Reply, Ex. 5. The report does not state that Jarrett was already standing outside when the first shots were fired or that the victims got out of their car in response to Jarrett getting out of the van.

In addition to the testimony of the witnesses at the scene, it is undisputed that Williams picked up Jarrett that morning and that they went to Williams's home to get guns. Resp. Ex. G at 54–55. They were then together all morning. Williams directed Allen to drive the van down Lexington and instructed her to stop and back up when they arrived at the place where the Lumina was parked. Resp. Ex. D at 246–49. Once the van had backed up and was even with the Lumina, Williams pushed Allen down and opened fire through her window. *Id.* at 252–53. McGee confirmed that Williams told Allen to turn down Lexington and to stop the van and back up. Resp. Ex. E at 7–8. She testified that Jarrett asked Williams, "Is that the guys?" *Id.* at 8. Like Allen, McGee testified that Williams pushed Allen down and fired through the window. *Id.* at 8–10. McGee said that after finishing shooting Williams instructed Allen to drive away and directed her to Jarrett's sister's home. *Id.* at 11.

Given the testimony of Allen, McGee, Starling, and Joshua, an affidavit executed by a purported eyewitness years after the shooting cannot "establish that no reasonable factfinder would have found the applicant guilty of the underlying offense." *Woods*, 589

15

F.3d at 377 (internal quotation marks omitted) (refusing to find actual innocence based on affidavits of family members establishing alibi that were written years later in light of the fact that there were two eyewitnesses). Actual innocence is difficult to establish when the new evidence offered is affidavits that contradict the testimony of witnesses at trial. *See, e.g.*, *Smith v. McKee*, 598 F.3d 374, 388 (7th Cir. 2010) (affidavits of two witnesses, one saying that petitioner was not the shooter and one providing an alibi, did not show actual innocence when trial evidence included two eyewitnesses and an incriminating statement by petitioner); *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) (six alibi witnesses did not establish actual innocence when six other witnesses identified petitioner as perpetrator at trial).

The case of *United States ex rel. Bell v. Pierson*, 267 F.3d 544 (7th Cir. 2001), is similar to the current case. There, Bell did not dispute that he had shot and killed Latham but claimed that he had done so in self-defense after Latham fired at him. *Id.* at 547. After conviction, he claimed actual innocence and offered testimony from an eyewitness who claimed to have seen both men firing at each other. *Id.* at 551. The court determined that this was not enough to show actual innocence because at trial there had been evidence that Bell pulled out his gun first, chased Latham, and shot him as he sat in a car. *Id.* at 553. Similarly, in this case Jarrett's evidence that a man pointed a gun at him does not establish actual innocence when trial evidence showed that he got out of the van after Williams opened fire and shot the victims as they were fleeing. A reasonable jury could conclude that Jarrett did not believe he had to act to defend himself from a threat, and thus that he was guilty of first-degree murder.

16

Finally, it is not disputed that the first shots were fired by Williams from the van. The Illinois Appellate Court found that because of Williams's shots, Jarrett (based on a theory of accountability) was an initial aggressor who could not claim self-defense. *Jarrett*, 399 Ill. App. 3d 715, 724, 927 N.E.2d at 763–64; *see* 720 ILCS 5/7-4; *People v. Morgan*, 187 Ill. 2d 500, 533–34, 719 N.E.2d 681, 700–01 (1999) (both self-defense and imperfect self-defense arguments require that defendant was not the aggressor). The court held that the contention that another person aimed a gun at Jarrett after Williams began firing did not affect whether Jarrett was justified in shooting the victims, because Jarrett and Williams were the initial aggressors. *Id.*

In sum, Jarrett has not demonstrated cause and prejudice or actual innocence. As a result, the Court cannot consider his first ten ineffective assistance claims, because they are procedurally defaulted.

### 2. Ineffective assistance related to accountability instruction

Jarrett's final ineffective assistance claim is that his attorney was constitutionally ineffective when he failed to object to the accountability instruction given to the jury. The state trial court instructed the jury that:

> A person is legally responsible for the conduct of another person when either before or during the commission of an offense and with the intent to promote or facilitate the commission of an offense he knowingly solicits, aids, abets, agrees to aid or attempts to aid the other person in the planning or commission of the offense.
> The word conduct includes any criminal act done in furtherance of the planned and intended act.

Resp. Ex. H. at 15. Jarrett argues that this instruction was improperly given because all the evidence indicated that he had shot the two victims, he admitted shooting them, and

17

the instruction allowed the jury to ignore his self-defense claim if it thought that he was responsible for the actions of Williams.

Jarrett made this argument in his first state post-conviction petition, and the Illinois Appellate Court considered it on appeal. The court determined that the accountability instruction was proper because "[j]ury instructions on accountability are justified if the State submits the slightest evidence to support an accountability theory." Resp. Ex. T at 10 (citing *People v. Calderon*, 369 Ill. App. 3d 221, 235, 859 N.E.2d 1163, 1176 (2006)). Without addressing the fact that Jarrett's trial counsel acknowledged that Jarrett had shot and killed both victims, the court reasoned that the evidence did not establish whose bullets had killed Key, so the jury could have inferred that the shots fired by Williams killed him. Resp. Ex. T at 10–11. The court held that an accountability instruction was therefore proper. *Id.* at 11. The court also held that any error in giving the accountability instruction was harmless. *Id.*

A federal court "may not grant habeas relief under 28 U.S.C. § 2254 merely because a state court has misinterpreted or misapplied state law. And [a court] will not fault counsel as ineffective for failing to advance a position under state law that the state appellate court said was meritless." *Lopez v. Thumer*, 594 F.3d 584, 587 (7th Cir. 2010). The Illinois Appellate Court interpreted Illinois law and found that an accountability instruction was proper. For these reasons, Jarrett's trial counsel did not render constitutionally ineffective assistance.

## B.     Ineffective assistance of appellate counsel

Jarrett contends that his attorney on direct appeal was constitutionally ineffective

18

for failing to argue that his trial counsel was ineffective for allowing the court to conduct an irregular fitness hearing, for not developing Starling's testimony that the victims initially moved toward Jarrett, for not insisting that all discussion between the trial court and the attorneys be on the record, and for not objecting to the accountability instruction given to the jury.

The first three claims of appellate ineffectiveness were presented for the first time in Jarrett's second state post-conviction petition. Further, after the trial court dismissed Jarrett's second petition, none of the three claims were included in his appellate brief or in his PLA to the Illinois Supreme Court. Thus Jarrett failed to fairly present them at each level of state court review. The claims are procedurally defaulted and, as discussed above, Jarrett cannot show cause and prejudice or actual innocence.

Jarrett's claim of appellate counsel ineffectiveness relating to the accountability instruction fails for the same reason as his claim of trial counsel ineffectiveness relating to the instruction. Appellate counsel is ineffective only if the attorney "failed to raise an issue that was both obvious and clearly stronger than the issues he did raise." *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). The Illinois Appellate Court decided that the accountability instruction was proper and that Jarrett's trial counsel had not been ineffective. Resp. Ex. T at 8, 11. Jarrett's appellate attorney did not miss an obvious or strong issue; the Illinois court itself determined that trial counsel had not erred.

## C.   *Brady* claims

### 1.   Withholding of eyewitness information

Jarrett's final claim is that the prosecution withheld material exculpatory

information from him in violation of his due process rights. In his affidavit, Charles

Ginns states that in 2000, he told police that he had seen Michael Blue point a gun at

Jarrett during the shooting and that Jarrett was out of the van before any shots were

fired. Pet. Ex. 5. Taking this as true, it reflects that the police knew about Ginns three

years before Jarrett's trial but did not inform Jarrett. (Jarrett was tried in 2003.)

Jarrett claims that in September 2003, he was visited in prison by Chicago Police

Detective Michael Cronin, who had arrested Jarrett for the murders. Cronin told Jarrett

that he knew of a witness to the shooting who could corroborate Jarrett's self-defense

story and help his case on appeal. Cronin offered to give Jarrett the identity of the

witness in exchange for information about the drug trade in the Lawndale neighborhood

of Chicago. Jarrett refused and instead asked his friends and family to look for the

witness. In April 2007, Ashake Banks learned that Ginns was the witness and told

Jarrett. Pet. Ex. 4.

Jarrett did not present this claim until he filed his second state post-conviction

petition in July 2007. The Illinois Appellate Court determined that the claim was

forfeited. *Jarrett*, 399 Ill. App. 3d 715, 728, 927 N.E.2d 767. As a result, the claim is

procedurally defaulted. Jarrett asserts, however, that he can show cause and

prejudice. The identity of Ginns and the substance of the testimony he could give were

known to police in 2000, but not disclosed to Jarrett before or during his 2003 trial.

After the trial, Cronin withheld Ginns's name from Jarrett in an attempt to obtain other

information. If Cronin had given Jarrett the name, he would have been able to make a

*Brady* claim in his direct appeal or his first post-conviction petition, which he filed in

2006. Without the name, however, all Jarrett could have said in that petition was that a

20

detective had told him that there was a witness who corroborated his story but that he could not find him.

Cause and prejudice "parallel two of the three components of the alleged *Brady* violation itself." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (internal quotation marks omitted). If Jarrett can show a *Brady* violation, he will also have established cause and prejudice. *See id.*

> A *Brady* violation can be broken down into three basic elements: (1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued—in other words, materiality. . . . Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

*Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008) (citations and internal quotation marks omitted).

Respondent contends that Ginns's evidence is not material. The Illinois Appellate Court determined that even if Jarrett had known what Ginns could have testified, it would not have made any difference at Jarrett's trial. *Jarrett*, 399 Ill. App. 3d at 728, 927 N.E.2d at 767. The court concluded that Jarrett and Williams were the initial aggressors and held that as a result, Jarrett could not claim self-defense. *Id.* The court made this finding both with regard to Jarrett's *Brady* claim, which it also held was forfeited, and his actual innocence claim, which it addressed only on the merits. *Id.* at 723, 727–28, 927 N.E.2d at 763, 766–67.

In Illinois, a defendant's use of force cannot be justified by self-defense if he was the initial aggressor. *Morgan*, 187 Ill. 2d at 533, 719 N.E.2d at 700. Additionally, first-

21

degree murder cannot be mitigated to second-degree murder if the defendant was the initial aggressor. *People v. Zapata*, 347 Ill. App. 3d 956, 963, 808 N.E.2d 1064, 1071 (2004); *see Morgan*, 187 Ill. 2d at 534–35; 917 N.E.2d at 700–01 & n.2. Thus the allegedly suppressed identity and testimony of Ginns can be material only if Jarrett was not an initial aggressor.

The Illinois Appellate Court's finding that Jarrett was an initial aggressor is presumed correct on habeas corpus review. Jarrett must rebut the presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Ben-Yisrayl v. Buss*, 540 F.3d 542, 547 (7th Cir. 2008) (presumption of correctness applies to findings made by state appellate court using trial court record).

Jarrett has not presented clear and convincing evidence that the Illinois Appellate Court's finding was incorrect. It is undisputed that Williams fired before Jarrett claims he felt threatened. Accordingly, Jarrett must show that the court erred when it found that he was accountable for Williams's shots. As discussed above, the testimony of Starling, Joshua, Allen, and McGee at trial could show that Williams and Jarrett were working in concert, with Williams flushing the victims out of their car and Jarrett shooting them as they ran. Jarrett himself testified that he and Williams both picked up guns from Williams's home when they went there. Resp. Ex. G at 54–55.

The jury also found that Jarrett was responsible for Williams's initial gunshots. It was not instructed on the initial aggressor rule, but it was instructed on accountability. Resp. Ex. H at 15. The jury found Jarrett guilty of aggravated discharge of a firearm, which required that he discharge a firearm in the direction of an occupied vehicle. *Id.* at 16–17, 105. Jarrett testified that he shot into the crowd of people running around after

22

Williams's shots. Resp. Ex. G at 71. Starling testified that Jarrett shot directly at the victims. Resp. Ex. D at 109–10. There was no evidence to suggest that Jarrett himself shot at the car. In short, in order to find him guilty on the aggravated discharge claim, the jury had to have found him legally responsible for the shots that Williams fired into the Lumina.

Against the evidence that indicates that he and Williams were acting in concert, Jarrett offers little to show that the Illinois Appellate Court was wrong to find that he was an aggressor because Williams shot first. Jarrett testified that he got out of the van to look for a friend and did not know that Williams fired the first shots. Resp. Ex. G at 31–32. Additionally, Allen, who had been riding with Williams and Jarrett before the shooting, did not testify that Williams and Jarrett discussed plans to go shoot anyone. McGee, who had also ridden with Williams and Jarrett, testified only that Jarrett asked Williams, "Is that the guys?" when they arrived on Lexington Street. Resp. Ex. E at 8.

In addition to the evidence presented at trial, Jarrett presents two new pieces of evidence, the Ginns affidavit and the police report previously discussed. Even combined with the trial evidence, however, these do not rebut the presumption that the Illinois court was correct when it found that Jarrett was an initial aggressor. Ginns's affidavit states that Jarrett was out of the van before any shots were fired. Resp. Ex. 4 at 1. But the fact Jarrett left the van before Williams opened fire (assuming it is a fact), does not mean that Jarrett could not have known that Williams was about to start shooting. Ginns also states that Blue pulled out his gun to shoot at Jarrett after Williams had fired, but that fact has no bearing on whether Jarrett was an initial aggressor based on the shots that Williams had already fired.

23

Similarly, the police report says nothing at all about Williams's shots, and thus it does not amount to evidence that Jarrett was not an aggressor based on the shots. In fact, the report states that an unnamed offender got of the van and shot at the victims immediately. Pet. Reply, Ex. 5. If Jarrett got out of the van and began shooting immediately, as the report and the testimony of Starling and Joshua tend to show, it is more likely that he was an aggressor who cannot claim self-defense under Illinois law.

For these reasons, the Court concludes that Jarrett has not presented clear and convincing evidence rebutting the presumption of correctness accorded to the Illinois Appellate Court's finding that he was an aggressor who could not claim self-defense or seek mitigation of first-degree murder to second-degree murder. Jarrett's new evidence is consequently not material, because even if he had access to Ginns's testimony and the police report at the time of his trial, the outcome would not have been different. As a result, Jarrett cannot establish a *Brady* violation based on the alleged concealment of the existence and testimony of Ginns.

### 2. Police report

In his reply, Jarrett asks to be allowed to amend his habeas corpus petition to bring an additional *Brady* claim related to the police report that he has presented as new evidence. The Court grants the request, but it does not affect the outcome. The evidence reflected in the police report is not material for the same reasons as the Ginns testimony discussed above. Even in combination with other evidence favorable to Jarrett, the police report does not contain clear and convincing evidence to rebut the Illinois court's finding that he was an aggressor who cannot claim self-defense or seek a second-degree murder conviction.

24

**D.    Certificate of appealability**

When a district court enters a final judgment adverse to a habeas petitioner, it must issue or deny a certificate of appealability (COA).  Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.  To obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The petitioner must show "that reasonable jurists could debate whether (or . . . agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  When a district court denies a claim on procedural grounds, the petitioner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

Jarrett procedurally defaulted the majority of his ineffective assistance of counsel claims.  Reasonable jurists could not debate that the claims were defaulted and that Jarrett has not established cause and prejudice or actual innocence.  Similarly, reasonable jurists could not debate that Jarrett's claimed *Brady* evidence is not material and that his ineffectiveness claims related to the accountability instruction fail because the Illinois Appellate Court held that the instruction was proper.  The Court therefore declines to issue a certificate of appealability.

## Conclusion

For the reasons stated above, the Court denies Jarrett's petition for a writ of

habeas corpus and his request for an evidentiary hearing. The Court declines to issue a certificate of appealability. The Clerk is directed to enter judgment in favor of the respondent.

MATTHEW F. KENNELLY
United States District Judge

Date:  December 20, 2011